United States v. Spivey. Mr. Adler. May it please the court. Andrew Adler from the Federal Defender's Office on behalf of Shaniqua Austin who's with us in the courtroom today. At counsel table with me is Tim Day. In this case two law enforcement officers deliberately perpetrated a fraud on Miss Austin in order to enter her home and search her master bedroom without a warrant. They concocted a scheme where they fraudulently told her that they were there to help her as the victim of a crime when in reality they were there to investigate whether she herself had committed a crime. And to get into her master bedroom they had a Secret Service agent falsely pose as a crime scene technician who pretended to dust her home for fingerprints. Miss Austin's consent was not voluntary. Okay so the that's the question right? Whether the consent was voluntary. There was consent but the question was it voluntary. That's correct. That is a question of fact that we review for clear error right? No usually that is correct your honor but this court has several cases which we cite on the top of page three of our reply brief which says where the facts and testimony are undisputed that this is a question of law because it's an application of law to undisputed fact. And in this case we are we are taking all the district court's factual findings as true and we are arguing that based on those undisputed factual findings that her consent was not voluntary as a matter of law. And so that is a question that this court reviews de novo. And I think there are two key factual findings that I'd really like to emphasize here. First on page two and this goes to the motive the reason why the officers came to the house. Page two Does the motive matter? Will you get to that? Because I've always thought with the Fourth Amendment the that the that the inquiry is objective not subjective. That what matters is whether what the officers were doing was reasonable without regard to their subjective intent. Your honor that is true in certain contexts like in the Wren case where we're looking at whether there's a probable cause and that's an objective determination. But we understand that the voluntariness inquiry to be subjective and that's why we look at the defendants age and intelligence and things like that. But but but it's it's the mind of the property owner or suspect that matters and that from that we're trying to determine whether that individual consented voluntarily right. I get that but from the standpoint of evaluating the peace officers conduct that that inquiry is objective isn't it it's not subjective it's not their motivation that matters. We submit that in order to determine whether somebody is voluntarily agreeing to allow officers into their home the paramount question is why do they want to come in your home? So we cannot and though that from that property owners perspective right. Yes but when the officers tell you that they are there for one purpose to help you as the victim of a crime when in reality they are there to determine whether you are committing a crime and if so to charge you with the crime and lock you up for several years then that is a paramount factor that goes into the voluntariness of the consent. Do you think that they made affirmative misrepresentations the way there was in some of these other cases where there was a direct question is this a criminal investigation in the in the IRS case and then they said no I didn't see an affirmative misrepresentation here can you point me to do you rely on that? Absolutely your honor we don't think there's any dispute that there's an affirmative misrepresentation in this case and the clearest example of that is the officers saying the district court found that they lied about who agent Lamprosy was they said that he was a crime scene technician when in reality who was there to follow up on that. I understand that so is that is that the main affirmative misrepresentation because they could easily have had a real tech I mean he didn't you know he didn't have some specialized knowledge or specialized eyeglasses once they said show us where the burglar went and she led them through the house that was really the ballgame wasn't it? Yes and that is why the misrepresent that affirmative misrepresentation was so critical here without that misrepresentation they don't get in the bedroom where they already suspect that the contraband is located. Now why is that that has had the same officer as it turned out the lead officer Iskowich was working the computer if they had swapped I mean Iskowich was what he said he was right an officer from the Lauder Hill Police Department she would have led him exactly the same place wouldn't he? Perhaps I mean we don't know that we suspect we suspect that there would have needed to be some additional misrepresentation to get in the bedroom it is not entirely clear that she would have led them to the bedroom without him prompting her to to show me where the burglar went but we're not disputing that if officers legitimately came to the home to follow up on the burglary that that would be a different case what makes this case so problematic is that the officers are making these misrepresentations and that her consent is induced thereby. From their perspective from the residents perspective they understand that these officers have the authority to investigate crimes and we they permit them to enter the premises isn't that right? That is right we actually think that fact cuts in our favor because it shows it really highlights the public policy problems that we have here the fact that they hid the evidence it a shows that the purpose of the officers mattered a great deal to them and second it shows that the the defendants in this case were relying in good faith on the fact that the officers were legitimately there to help them and how does that show that they were relying on that it seems to me to show the opposite if they were hiding incriminating evidence it suggests that they understood that if the officers came in and saw that evidence that they could do something about it. Precisely and that's why if the officers told her the truth she would not have let them in and we know that from all the surrounding not only from common sense but from surrounding circumstances when she was standing outside the officer showed up she was alarmed she immediately went inside she hid the thing in the oven then when they tell her why they're really there she she gambled she gambled she was took a calculated risk right doesn't that suggest voluntariness? No your honor there's a distinction between the wisdom of her calculation and the voluntariness of her consent. I don't think we have a dispute about the wisdom. Correct we agree it was not a wise decision that does not mean that her consent was voluntary and and the fact that she made this calculation it was missing she did that missing the most important piece of the puzzle which is why they were there and again we submit that common sense the record tells us that if she was really told the truth she would have she would have reached the opposite decision and that's precisely why the officers concocted this elaborate ruse to get into her home because if she they told her the truth it's it's a closed door in their face and so we submit that common sense principles this court's precedence in in Tweal and in the ESM case established a general rule of thumb that where consent is induced by material misrepresentation it's not going to be voluntary and it's not going to be the product of a free and unconstrained choice and again the ESM... Do you agree that we should look at the totality of the circumstances though in I guess you would say in deciding the question of law reason I'm bulking a little bit is that usually when we talk about totality of the circumstances that's exactly what makes it a factual question. Typically that is that is true we are not disputing the totality of the circumstances inquiry but we're not disputing any of the factual findings in the district court's order and if I could just come back to that the two that I really want to harp on our page two paragraph two of the order where the court says that the burglary investigation was quote a pretext it was quote not the real reason why they were there. It said that they also had a legitimate reason for being there. The district court says a couple of different things that point in different directions. Your Honor we don't the other factual findings on page five paragraph ten where he says to the extent the burglary investigation was played any role whatsoever and it does not find that it did but to the extent it did it was quote very minimal so we have a situation... They did use some of the That's correct but that does not change the fact that that is not the real reason why they came to the house in the first place and in fact the fact that they obtained this video surveillance was all part of the ruse. That is what allowed them to to buy time with Spivey at the computer while Lantford... Isn't that just like for Wren in the sense that you stop a person for a reason that does exist but that wasn't the reason that you stopped them? Your Honor, Wren involves the probable cause determination to make a traffic stop. There's no question of voluntariness in that situation. It's a question of the objective. Is there probable cause regardless of what's going on in the officer's mind? We cannot draw that separation here when we're talking about the voluntariness of someone's consent to let you into their home where Fourth Amendment interests are at their peak and if the homeowner does not know really why that officer is there then we submit that that is the quintessential factor. Thank you. Okay, you saved five minutes for rebuttal Mr. Adler. Thank you. So Mr. Smith you want to add a minute on behalf of your client Mr. Spivey. What I really wanted to do is just make sure that the court understands and I want to reiterate that Mr. Spivey and Ms. Austin are wholly aligned on the arguments and presented in the case and I know in the court below the Federal Public Defender's Office with Mr. Tim Day filed the initial motion of which Mr. Spivey adopted and joined in and in this case if you'll notice my brief basically is an adoption so I wanted to reiterate to make sure the court understands they're totally aligned, coordinated. We have met on numerous occasions. I've assisted in the research and factual presentation and independently participated in it but having been a lawyer now for and appearing before the court for probably 40 years and doing oral arguments up in Atlanta when you used to all have it up there. I know the old adage that a well-seasoned lawyer knows when to be quiet and sit down and so therefore I deferred to the arguments in the presentation of co-counsel. I wanted the court to know that. Thank you. Thanks. Eight seconds to spare. Mr. Kerensky. Thank you, Your Honor. Oh, by the way, Mr. Smith, we know you were court appointed. Thank you very much. Since you're not going to have a little time. May it please the court. My name is Jonathan Kerensky. I'm the Assistant United States Attorney who had this case at the trial level and with me at counsel table is John Shipley who wrote the brief. Your Honor, the suggestion that the standard of review in this case should be de novo is not found. The Garcia case that they support that argument with is an outlier. They also cite a Simmons case where no facts actually were in dispute but here are facts. What facts are in dispute here? Well, ultimately the predominant fact is the voluntariness inquiry which is a totality of circumstances test but there are other facts in dispute as well. Whether there was a gamble at the district court level and I was at the district court. You say Garcia is an outlier. Does it say that voluntariness can be a question of law if the facts are undisputed? It does, Your Honor, but in Garcia, all of the facts by the district court were taken in favor of the non-prevailing party. Here, a number of the facts were in favor of the government, the prevailing party. Garcia was a government appeal where the district court viewed the facts in favor of the non-prevailing party and ultimately made a determination regarding the voluntariness. But it hasn't been, no other 11th Circuit cases have adopted that standard on a record like ours. Where there was the totality of circumstances test that was employed, where there weren't a number of facts in dispute. They attempted to impeach Detective Eviskevich based on his deposition testimony, which he gave in the state court for the attempted murder charge based on the weapon that was recovered from the house. So the suggestion that facts weren't in dispute is belied by the record in this case. They attempted to impeach- What facts that were in dispute were material to the voluntariness determination by the district court? Ultimately, three sets of facts. Whether Austin was the one who led the agents through the house, or whether the agents directed her. Because that was material with regard to whether it was within the scope of the ruse, or whether they exceeded their invitation. That was the primary one, and a portion of that argument was predicated on the notion that she somehow cursed at them. That she cursed at Detective Eviskevich. And Detective Eviskevich addressed that and said, she never specifically cursed at us. It was just her attitude with regard to taking an opportunity to help herself out, explaining where that embossing machine came from. And what she resorted to was the lie that she concocted prior to the police coming to the house, the lie that she planned with Spivey, Spivey resorted to it also. And they had it in place because they're the ones that invited- Is that one of the disputes of facts, is whether that was a rehearsed kind of response? No, your honor. So with regard to the other disputed facts, the other disputed facts aside from who led them through the house, is also whether Spivey at any point, excuse me, whether the review of Spivey's phone was conducted subsequent or before his consent. So Mr. Day attempted to cross-examine Detective Eviskevich to suggest with that deposition transcript that in fact he started reviewing the phone before Spivey consented and Detective Eviskevich denied that. I don't know what that has to do with the dispute of fact, at least as to whether the initial entry into the home was voluntary or not. Well, your honor, because it's a totality of circumstances test, one of the factors that the courts look to is the defense- Has Spivey's consent cured any earlier violation? Well, it goes to that as well, but it goes to the level of cooperation throughout the entire day, because that goes to the totality of the circumstances, which is a factor in the first instance. It does also go to that attenuation analysis. The third- Let me ask you about that, because I didn't see that you all really discussed that in your brief. So, of course, they say once there's an unlawful entry into the house, that's it, that you don't even get to the attenuation analysis. That's right, your honor. They do make that claim, but that would really derogate the fruit of the poisonous tree line of cases. I think that what Delancey, and it's DICTA, but what Delancey stands for is if the express purpose of the officers in entering the home is to obtain a consent later, to use the legality to obtain that consent, then you could by-step the other prongs of the analysis. But that's clearly not what the case is here. I mean, that's the argument, that that's what the officers did here. Sure, but this wasn't flagrant, your honor, and the district court found that it wasn't flagrant. First, they had consulted their supervisors. They thought- Why didn't they get a warrant? It seems like it would have been easier to just get a warrant. The inquiry here is whether Ms. Austin's consent was voluntary, but with regard, and there's no requirement of exhaustion of going through one method rather than another. But whether there's probable cause based on a burden or- There's no requirement for a warrant when you go in somebody's house. But what Schnecklaw stands for is the proposition that that's a fundamental requirement, but just as fundamental is that consent searches are lawful, that that's equally well settled. And Schnecklaw- Well, I mean, they had a lawyer on standby in case they needed to get a warrant. I mean, they just go in and get one. Sure, and that third fact that was in dispute was whether Ms. Austin told them to leave, that whether she cursed at them and told them to leave. And so they would have needed a warrant at that point, because at that point they had seen in plain view through the course of the invitation items that were suggestive of credit card fraud, which corroborated a burglar who's trying to help himself out. And you said that- I'm sorry, go ahead. That they would have had to leave. Am I right that the business about cursing and whatever was after she was already out in the yard and they knew that she had a warrant out for her so they would be able to take her away, which gets you into the Randolph versus Georgia line, even if we believed that she had, quote, told them to leave, wouldn't you? They probably would have done what they did, which was talk to Spivey, who was the sole remaining cohabitant. Sure, the point of having the state attorney on standby was, even if they didn't initially have probable cause, they envisioned scenarios where they would establish probable cause, but not be in a situation to execute the search. They didn't presume that they would consent to a search, and they also- Even before they got to the bedroom, they saw some things. That's right, Your Honor. Isn't it more likely what you really have here, police talk about knock and talk. That is, they could have done it just as a knock and talk. Their ruse got them a little further into it, but as the old line says, you can get more with a gun and a kind word. And with a gun alone, they could find out perhaps more without going in the adversarial nature of a warrant. Isn't that really why they did it? Your Honor, it's perhaps not a best practice. And we're not asking the court to write an opinion that this is the best practice. What we're asking the court to do is to not extend TWEAL, to rely on the ordinary Fourth Amendment jurisprudence, deploy the same voluntary- Where would you draw the line with TWEAL? Is it because the misrepresentation was so affirmative and so critical to giving the consent, or how would you draw a line if we have to? Well, Your Honor, I think the Fourth Amendment eschews bright line tests. I think that what you did as Chief Judge in Rutherford in noting that TWEAL was IRS, the civil criminal split, which other circuits have also understood TWEAL to stand for, is a proper line drawing. And I don't think extending TWEAL to the proposition that in the 11th Circuit, nowhere else- Are you saying that then the distinction is when the misrepresentation would suggest to the suspect that this officer, this is not someone who has the authority to investigate crimes versus someone who does? That's a way of drawing, yes, Your Honor, that's a way of drawing the distinction. I just was trying to, is that the distinction you were making? That's what I'm trying to understand. Well, TWEAL is even stronger than that, though, because in TWEAL- Let me follow up with that. So, did Agent Lansforsyke, if I'm saying his name correctly- Close, Your Honor, yes. What, how do you say it? Lansforsyke. Lansforsyke. And Eviskevich. Did he have authority to investigate a burglary? Your Honor, he had authority to participate in the- Did he have authority to investigate a state burglary? No, Your Honor. He didn't have authority to investigate a state burglary. It wasn't one of his arresting statutes, but he had authority to be there on that day. And the question was whether his invitation to that home was voluntary. That's the inquiry which I suggest the court should deploy. TWEAL involved the IRS taking upon themselves to seek business. Here, Ms. Austin and Mr. Spivey each filed police reports to seek the return of their property. And then police in uniform showed up to their door and said, we're here to investigate the burglary, which was true. The district court specifically- How is it true? How is it true? I mean, they had already caught the burglar. Well, Sunrise had caught the burglar in a different jurisdiction. This was a prolific burglar. But that's how they knew to go back there. They had spoken to him, right? Well, yes, Your Honor. That undermines the probable cause going back to your other issue. This was a prolific burglar. And so while they had caught him and he had confessed to robbing that house, just catching somebody and getting a confession isn't even enough to secure a conviction. And even if it was, there's no requirement that law enforcement stop gathering evidence. And the district court specifically found, and it's supported by the records and the- One of the jurisdictions had closed their file on the burglary, correct? That's Sunrise. They had to close their file on the burglary. It was done. Yes, Your Honor, in Sunrise, Florida. Which- This burglary because this burglary isn't in Sunrise. Correct, Your Honor. So this was a prolific burglar, which would go to the issue of whether his word alone would have been sufficient for probable cause for the warrant as well. It was sufficient enough to get him to go to the house to go through it, right? Sure, and consent searches are often employed in that type of manner, or even with less particular facts, because they avoid the need for more exacting searches, the suspicions could be dispelled. And here, Spivey and Austin decided that they wanted to conscript the police to be their private collection agency, and in doing so, they were going to rely on them, allow them into their house for their limited purposes, but everything that the police did was limited by Ms. Austin. They did not, in the course of the initial entry, go outside of that scope whatsoever. And so the suggestion that it was- Well, I mean, did the burglar go here? Then I need to go there. I mean, isn't that the way it went? Well, it was, can you show me where the burglar went next? Something to that effect. And it was Ms. Austin's calculation that in order to get the police assistants to assist her with the burglary, that she was going to rely on them, and she decided to do so. And it was her calculated gamble that she would be able to talk her way out of any evidence, and they concocted a story, and they hid what they couldn't otherwise do. If the court has trouble with this and wants to draw a bright line and extend TWIL, it doesn't mean that the district court would- I don't see how we can draw a bright line when the Supreme Court says we have to look at the totality of the circumstances. Sure, sure. And here, the district court, in its totality, every other circumstance is in favor of consent in this particular case. And perhaps in other deception cases, it'll be more difficult because you wouldn't necessarily have a post-morandum confession where the suspect specifically describes their motives in allowing the police in but not reporting other crimes. There's the public policy argument that victims won't report crimes. But here, specifically, Austin talked about how Spivey used that gun to shoot the child's with regard to intruders. That's in her statement that she made to the police subsequent in a post-Miranda statement. So they were sophisticated actors who had experience with the police and knew which cases they could report and which cases they shouldn't report. The government would also win on attenuation analysis. Once the ruse is up, and so like Delancey, you need not even address the lawfulness of the ruse, although the government submits in this case that the record supports its has an opportunity to consider his options and he decides that he wants to stick with his gamble, that he wants the police's attempt and that by consenting, he'll distance himself and he'll also dispel any suspicions the police have. He tries to talk himself out of it and he elects to consent on that basis. And the cat was not out of the bag as was suggested by the appellant in their brief because by that point, the weapon had not been recovered. The card reader had not been recovered from the oven and specifically the phone, which was only searched after two different consent forms were provided to Mr. Spivey, also had substantial, significant, and sufficient independent evidence to secure convictions in this case. So on his phone was pictures of Mr. Spivey holding his gun, taking a selfie picture at the phone. The gun's serial number was illegible. You mentioned that both officers were uniformed? Yes. Yes, Your Honor. And so does the record tell us what they were wearing? It does, Your Honor. I believe both Agent Lanforseek and Evaskevich testified to police jackets, clear police insignia, and that Ms. Austin went inside to say the police are here. Did Lanforseek know or do anything that some other legitimate Lauderhill officer couldn't have done? That is, did he have specialized knowledge that they needed to have him rather than somebody else? No, Your Honor. And the district court even made a finding to that effect that based on the circumstances in this case, including being in a position to listen to the post-Miranda statements and the fact that previous patrol officers had been to the entryway of that house, that they would have been in a position to make the same findings and to establish the same evidence in that regard. For the reasons I see, I'm over my time. You are. And we appreciate your argument. We think we understand your case. Thank you. And I'd ask that you affirm the district court order below on either of those basis. Thank you. Thank you, Mr. Kabretzky. Mr. Adler. Thank you. Perhaps this was not the best practice, I think, is the dramatic understatement of the day. We have a . . . Basically, your case comes down, does it not, to the officers were there not to help them as your client believed, but to bust them. That is a critical component of our argument, yes, because we think that when Ms. Austin was operating on a version of reality that was the polar opposite of the truth, we do not see how her consent under those circumstances could be the product of a free and unconstrained choice. They thought they were only there to help them. Why did they hide the machine in the oven? I mean, you know . . . Well, before they . . . If the police come to my house to investigate a burglary, I don't usually hide incriminating evidence. Sure, but they didn't know why the officers were there until they knocked at the door and affirmatively told them why they were there. They could have been concerned that they were there to investigate the credit card fraud. And so once they learned why the officers . . . Your Honor, the defendants didn't know who the officers were until they knocked on the door and told them falsely who they were. I mean, not only did they not mention that this was not a Secret Service agent who had no experience whatsoever with crime scene fingerprint analysis, but they also didn't mention that Detective I was detached to a Secret Service Fraud Task Force, which exclusively investigates fraud, and he was not assigned to investigate the burglary. I agree with your adversary's answer to my question that Landfor-Seek did not ascertain anything due to some specialized knowledge of his Secret Service status, that had they in fact gotten a Lauder Hill evidence tech, everything else would have gone down exactly the same. Well, I mean, that's speculation, but yes, Landfor-Seek had no specialized knowledge of burglaries because he doesn't investigate burglaries and he's not a crime scene technician. He admitted that he's never . . . If he had been a Lauderdale officer, he would have also been able to see the suspicious evidence of credit card fraud, right? I mean, the burglar himself was suspicious, right? If they had gotten to the bedroom, they would have seen items in plain view, but, Your Honor, that begs the question of why didn't they just send legitimate officers who were following up on the burglary in the first place? One, you concede, is, right? I'm sorry? One of the two officers is. We do not concede that, Your Honor, because we look at the factual findings that the district court made, and again, page 2, paragraph 2, page 5, paragraph 10 of the order, the district court does not find that Detective I was legitimately there for the burglary. He finds, to the extent that he was . . . I thought the district court specifically said that they had a legitimate reason for being there. No, Your Honor, the district court says that there was a legitimate reason for some officers to go there, but not necessarily these two officers, and so this is a totally different case. If there's legitimate follow-up, if there's two Lauderdale officers who are actually following up on the burglary, then there's no deception . . . But I find it slightly confusing, perhaps, the motive and the personnel. That is, you're trying to say, okay, Lanforseek is a Secret Service guy, and Ivaskievich, even though he is a legitimate officer, he doesn't usually do this stuff. But again, how would anything have gone down differently if they were two legitimate burglary officers who, of course, know the story and know that probably this is an operation that they'd like to get inside and see? The difference is . . . I mean, your motive argument I understand, but the personnel argument, they didn't say, oh, we're going to let you in because you're a Secret Service agent. But that is exactly why they let the officers in, because they thought there was a legitimate follow-up. So if they tell them the truth . . . Purpose, not personnel. That's the reason. Well, if they told them that this was actually a Secret Service agent, I think one could draw the conclusion that Secret Service doesn't usually investigate burglaries, and in fact, they don't. And so I think it's important to bear in mind here that we have a venerable Fourth Amendment principle that warrantless searches of the home are presumptively unreasonable, and the We believe that if the search in this case is upheld, it would allow that consent exception to swallow the very Fourth Amendment rule that is so long-standing, the very core of which was designed to protect the homes. And I also think that this Court is bound not only by TWEAL, but by the ESM case, which interpreted TWEAL to say that, listen, TWEAL is not limited to IRS. That wasn't an IRS case. The Court said that the general rule announced in TWEAL is based on public policy considerations, and I see that my time is winding up, but I'd— I have a question before it runs out. So the other side says all problems are done away with because Ms. Austin gave these post-Miranda statements. What's your best case to respond to that? Your Honor, our best case is the Timmon case, the case that Judge Breyer joined from 2013 that says when you use evidence that's found during an initial unlawful search to elicit statements, then that's fruit of the poisonous tree. And the Delancey case, the Santa case, all compel that conclusion. So this Court cannot affirm on that alternative ground. The Court has to address the voluntariness of Austin's statements, and if I could just circle back to begin where I left off, which is—it's something that Justice Brandeis said in his famous Olmstead dissent. He said that when the government becomes a lawbreaker, it breeds contempt for law. It invites every man to become a law unto himself. It invites anarchy. And we submit that upholding the search in this case would do precisely that. And while the defendants did commit a fraud, so too did the government agents. And two frauds don't make a right. We ask that the Court reverse the denial of the motion to dismiss. It's not a—they're not lawbreakers in the sense that the— We submit that the officers in this case were engaged in the exact type of— They weren't there to plant evidence. They were there to find incriminating evidence. Correct. There is a pretty important—but we understand your case is well argued and very interesting. Thank you, Your Honor. Thank you, Mr. Adler. We'll hear the next case.